1    Cheryl A. Williams (Cal. Bar No. 193532)
     Kevin M. Cochrane (Cal. Bar No. 255266)
2    caw@williamscochrane.com
     kmc@williamscochrane.com
3    WILLIAMS & COCHRANE, LLP
     525 B Street, Suite 1500
4    San Diego, CA 92101
     Telephone: (619) 793-4809
5

6    Attorneys for Plaintiff
     PAUMA BAND OF MISSION INDIANS
7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11   **PAUMA BAND OF LUISENO MISSION**          Case No.: 09CV1955 AJB MDD
     **INDIANS OF THE PAUMA & YUIMA**
12   **RESERVATION**, a/k/a PAUMA LUISENO        **PAUMA'S NOTICE OF MOTION AND**
     BAND OF MISSION INDIANS, a/k/a PAUMA       **MOTION FOR PROTECTIVE ORDER;**
13   BAND OF MISSION INDIANS, a federally        **OBJECTIONS TO AUGUST 23, 2011**
     recognized Indian Tribe,                    **ORDER PURSUANT TO FED. R. CIV. P.**
14                                                **72(A)**
                     Plaintiff,
15                                               Date:      February 24, 2012
             vs.                                 Time:      1:30 pm
16                                               Dept:      12
                                                 Judge:     The Hon. Anthony J. Battaglia
17   **STATE OF CALIFORNIA**; **CALIFORNIA**
     **GAMBLING CONTROL COMMISSION**, an
18   agency of the State of California; and **ARNOLD**
     **SCHWARZENEGGER**, as Governor of the
19   State of California;
20                   Defendants.
21

22

23

24

25

26

27

28

**TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Please take notice that at 1:30 p.m. on February 24, 2012, or as soon thereafter as counsel may be heard, in Courtroom 12 of the Edward J. Schwartz United States Courthouse at 940 Front Street, San Diego, California 92101-8900, the Pauma Band of Mission Indians will move for a non-discovery related protective order to prevent all non-policy making attorneys with the Attorney General's Office, the Office of the Governor, and the California Gambling Control Commission from communicating with representatives of Pauma about the merits of the litigation without the presence or prior consent of the Tribe's counsel of record.  Further, Pauma will also request that the Court order the State defendant's to produce all evidence of previous *ex parte* communications so the Tribe can determine the extent of any breach of the attorney client privilege and ensure that it will not affect the integrity of future proceedings before the district court.

While Pauma previously made a motion to prevent such communications under Federal Rule of Procedure 26(c) ("Rule 26(c)"), Magistrate Judge Dembin summarily denied the motion on the basis that it did not allege a discovery dispute.  Because the merits of the motion were never addressed, Pauma brings this current motion, outside of the umbrella of Rule 26(c), to seek alternate relief in the form of a protective order generally.  In addition, the present motion also includes objections to Judge Dembin's order denying the motion pursuant to Federal Rule of Procedure Rule 72(a) for purposes of preserving Pauma's rights on appeal.

The reason Pauma moves at this juncture is that the State alleges that the only defense attorneys that are subject to California Rule of Professional Conduct 2-100 are the three whose names appear on the caption for the State's pleadings.  This narrow view of Rule 2-100 enables the State to claim that a senior attorney advisor with the Office of the Governor – as well as any other attorney from the Attorney General's Office or one of the other named offices and agencies – can communicate *ex parte* with representatives of Pauma about the merits of the litigation and the potential for settlement without the presence or advance consent of the Tribe's counsel of record.  It also shields the State from disclosing the extent of this attorney's prior unpermitted *ex parte* contacts and whether those contacts exposed information protected by the attorney/client privilege.  At a minimum, Pauma respectfully requests the Court's guidance in determining the applicability of Rule 2-100 to the implicated attorney in order to

1    resolve the present situation and prevent further disruptions in the proceedings.  This motion is based on

2    the accompanying memorandum of points and authorities; the new declaration of Cheryl A. Williams;

3    and all evidence submitted herewith, including the prior *ex parte* motion for a protective order and its

4    associated declarations.

5            DATED this 6th day of September, 2011.

6                                                    THE PAUMA BAND OF MISSION INDIANS

7
                                                     By: */s/ Kevin M. Cochrane*
8                                                    Cheryl A. Williams
                                                     Kevin M. Cochrane
9                                                    caw@williamscochrane.com
                                                     kmc@williamscochrane.com
10                                                   WILLIAMS & COCHRANE, LLP
                                                     525 B Street, Suite 1500
11                                                   San Diego, California 92101
                                                     Telephone: (619) 793-4809
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2   INTRODUCTION………………………………………………………………........... 1

3   STATEMENT OF FACTS ………………………………………………………….. 3

4
    LEGAL STANDARD ……………………………………………………………..... 11
5
    OBJECTIONS TO ORDER ON EX PARTE MOTION …………………………………... 11
6
7         I.      SUMMARY OF OBJECTIONS …………………………………………… 11
          II.     EXPLANATION OF OBJECTIONS ………………………………………… 12
8                 A.      OBJECTION NO. 1: THE ORDER IS CONTRARY TO NINTH
9                         CIRCUIT PRECEDENT REQUIRING COURTS TO EXAMINE
                          ALLEGATIONS OF UNETHICAL CONDUCT …………………………… 12
10                B.      OBJECTION NO. 2: THE ORDER IS CONTRARY TO LAW
                          REQUIRING COURTS TO LOOK PAST TECHNICAL DEFECTS
11                        IN ORDER TO ADDRESS ALLEGATIONS OF ETHICAL
                          MISCONDUCT ………………………………………………… 13
12                C.      OBJECTION NO. 3: THE ORDER'S WHOLESALE ADOPTION OF
                          THE STATE'S ARGUMENT THAT JACOB APPELSMITH IS NOT
13                        PARTICIPATING AS AN ATTORNEY IN THIS MATTER IS BOTH
14                        CLEARLY ERRONEOUS AND CONTRARY TO LAW …………………… 14

15  ARGUMENT ……………………………………………………………………… 15

16        I.      AS THE STATE'S PRINCIPAL NEGOTIATOR OF TRIBAL/STATE GAMING
17                COMPACTS LIKE THE ONE HEREIN INVOLVED, JACOB APPELSMITH
                  VIOLATED RULE 2-100 BY ENGAGING IN EX PARTE COMMUNICATIONS
18                WITH REPRESENTATIVES FROM PAUMA FOR THE PURPOSE OF
                  ATTEMPTING TO SETTLE THE CASE WITHOUT THE KNOWLEDGE OF THE
19                TRIBE'S COUNSEL OF RECORD ………………………………………….. 15
20                A.      JACOB APPELSMITH REPRESENTS THE OFFICE OF THE GOVERNOR
                          IN ALL GAMING COMPACT MATTERS ……………………………..... 16
21                B.      EACH TRIBAL COUNCIL MEMBER QUALIFIES AS A PARTY TO THE
22                        LAWSUIT …………………………………………………………….. 21
                  C.      THE PUBLIC OFFICER EXCEPTION DOES NOT EXEMPT JACOB
23                        APPELSMITH FROM RULE 2-100'S PROHIBITION ON EX PARTE
24                        COMMUNICATIONS ………………………………………………… 23
                  D.      THE REQUESTED RELIEF IS CUSTOMARY IN CASES INVOLVING
25                        EX PARTE COMMUNICATIONS ……………………………………… 25
26
    CONCLUSION………...…………………………………………………………… 26
27

28

# TABLE OF AUTHORITIES

**CASES**

*Abeles v. State Bar,*
  9 Cal.3d 603 (1973) ……………………………………………………………… 15, 19

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. State of Cal.,*
  618 F.3d 1066 (9th Cir. 2010) ……………………………………………………... 17

*Cleland v. Superior Court,*
  52 Cal.App.2d 530 (3d Dist. 1942) ……………………………………………….. 23, 24

*Empire Linotype School v. U.S.,*
  143 F.Supp. 627 (S.D.N.Y. 1956) ………………………………………………… 11

*Erickson v. Newmar Corp.,*
  87 F.3d 298 (9th Cir. 1996) ………………………………………………………. 11, 13

*Ferrara v. La Sala,*
  186 Cal.App.2d 263 (2d Dist. 1986) …………………………………………….. 17

*Gas-a-Tron of Az. v. Union Oil Co. of Cal.,*
  534 F.2d 1322 (9th Cir. 1976) ……………………………………………… 1, 10, 11, 12, 13

*Hammond v. City of Junction, Kan.,*
  167 F.Supp.2d 1271 (D. Kan. 2001) ……………………………….. 1, 10, 11, 12, 13, 25

*Hewlett Packard Co. v. Superior Court,*
  252 Cal.Rptr. 14 (4th Dist. 1988) ……………………………………………….. 21

*Holland v. Island Creek Corp.,*
  885 F. Supp. 4 (D.D.C. 1995) ……………………………………………………… 14

*In re Dale,*
  2005 WL 1389226 (Cal.Bar Ct. 2005) …………………………………………... 16

*Libarian v. State Bar,*
  21 Cal.2d 862 (1943) …………………………………………………………….. 15, 20

*Miller v. Metzinger,*
  91 Cal.App.3d 31 (2d Dist. 1979) ……………………………………………….. 17

*Mills Land & Water Co. v. Golden W. Refining Co.,*
  186 Cal.App.3d 116 (4th Dist. 1986) …. ………………………………………... 21

*Mitton v. State Bar,*
  71 Cal.2d 524 (1969) ……………………………………………………………… 16

*Perkins v. W. Coast Lumber Co.,*
129 Cal. 427 (1900) …………………………………………………………….. 17

*Resnick v. Am. Dental Ass'n,*
95 F.R.D. 372 (N.D. Ill. 1982) …………………………………………... 7, 25

*Responsible Citizens v. Superior Court,*
16 Cal.App.4th 1717 (5th Dist. 1993) …………………………………… 17

*Richardson v. Hamilton Int'l Corp.,*
469 F.2d 1382 (3d Cir. 1972) …………………………………………… 10

*Rincon Band of Luiseno Mission Indians of the Rincon Reservation v. Schwarzenegger,*
602 F.3d 1019 (9th Cir. 2010) ………………………………………….. 17

*Silver v. Executive Car Leasing Disability Plan,*
466 F.3d 727 (9th Cir. 2006) …………………………………………… 14

*Smallberg v. State Bar,*
212 Cal. 113 (1931) …………………………………………………… 15, 18

*Trone v. Smith,*
621 F.2d 994 (9th Cir. 1980) …………………………………………… 13

*Trust Corp. of Mont. v. Piper Aircraft Corp.,*
701 F.2d 85 (9th Cir. 1983) …………………………………………….. 11

*Turnball v. Topeka State Hospital,*
185 F.R.D. 645 (D. Kan. 1999) ……………………………… 1, 10, 11, 12, 13

*Turner v. State Bar,*
36 Cal.2d 155 (1950) …………………………………………………... 15, 19

*U.S. v. Lopez,*
4 F.3d 1455 (9th Cir. 1993) …………………………………………….. 23

*U.S. v. Sierra Pac. Indus.,*
759 F.Supp.2d 1215 (E.D. Cal. 2011) …………………………… 10, 16, 24

*U.S. v. Talao,*
222 F.3d 1133 (9th Cir. 2000) ………………………………………… 16, 23

*U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.,*
132 F.3d 1252 (8th Cir. 1998) ………………………………………… 11, 25

*Westinghouse Elec. Corp. v. Kerr-McGee Corp.,*
580 F.2d 1311 (7th Cir. 1978) …………………………………………... 17

**DOCKET CITES**

*Pauma Band of Mission Indians v. State of Cal.*,
    Civ. Case No. 09-01955 AJB MDD (S.D. Cal. filed on Sep. 4, 2009) ............. 1, 5, 7, 9, 10

*U.S. v. Sierra Pac. Indus.*,
    No. 09-02245 JAM EFB (E.D. Cal Nov. 15, 2010) .............................................. 25

**STATUTES**

Indian Gaming Regulatory Act
    25 U.S.C. § 2701 *et seq*...................................................................................... 2

Cal. Gov't Code
    § 1001 .................................................................................................................. 4
    § 1300 .................................................................................................................. 4
    § 1303 .............................................................................................................. 4, 23
    § 1320 .................................................................................................................. 4
    § 1321 .................................................................................................................. 4
    § 6250 *et seq*...................................................................................................... 6

**RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    26(c) ............................................................................ 1, 7, 10, 11, 12, 13
    72(a) ..................................................................................................................1

Restatement (Third) of Law Governing Law.
    § 101(2) ............................................................................................................. 24
    § 101 cmt. c .................................................................................................... 24

Civil Local Rules for the Southern District of California
    83.4(b) ............................................................................................................. 16

American Bar Association's Model Rules of Professional Conduct
    2.1 ................................................................................................................... 17
    4.2 cmt. 1 ....................................................................................................... 16
    4.2 cmt. 4 ....................................................................................................... 20
    4.2 cmt. 6 ....................................................................................................... 21

California Rules of Professional Conduct
    2-100 ....................................................... 6, 8, 9, 10, 12, 13, 14, 15, 16, 21, 23, 25
    2-100(B)(1) ..................................................................................................... 21
    2-100(C)(1) ................................................................................................. 23, 24

**ETHICS OPINIONS**

Formal Opinion No. 1988-103 of the State Bar of Cal. ..............................................

Formal Opinion No. 1991-125 of the State Bar of Cal. ……………………………………….. 15, 18

Formal Opinion No. 1993-132 of the State Bar of Cal. ……………………………………….. 17, 20

Proposed Formal Opinion Interim No. 98-0002 of the State Bar of Cal. …………………………. 24

Opinion No. 09-1 of the Florida Bar (Dec. 10, 2010) …………………………………………… 25

Formal Opinion No. 22 of the Idaho State Bar …………………………………………………….. 19

Informal Ethics Opinion No. RI-145 of the State Bar of Mich. (Oct. 1, 1992) ………………….. 19

Informal Ethics Opinion No. RI-166 of the State Bar of Mich. (June 3, 1993) …………………. 20

Opinion No. 652 of the N.Y. State Bar Ass'n (Aug. 27, 1993) ………………………………….. 25

Opinion No. 768 of the N.Y. State Bar Ass'n (Oct. 8, 2003) ……………………………………. 19

Opinion No. 812 of the N.Y. State Bar Ass'n (May 3, 2007) ……………………………………. 25

Formal Opinion No. 2005-6 of the Or. State Bar (Aug. 2005) ………………………………….. 19

Formal Opinion No. 2005-80 of the Or. State Bar (Aug. 2005) ……………………………….. 21, 22

Opinion 17 of the State Bar of Texas, 18 Baylor L. Rev. 200 (Dec. 1948) ……………………….. 19

Advisory Opinion No. 1738 of the Wash. State Bar Ass'n (1997) ……………………………….. 17

Advisory Opinion No. 1984 of the Wash. State Bar Ass'n (1997) ……………………………….. 17

Ethics Opinion 1968-2 of the San Diego County Bar Ass'n (Dec. 3, 1968) ……………………… 19

**SECONDARY AUTHORITIES**

C.J.S. Attorney & Client (2011)
    7 § 42 …………………………………………………………………………………………….. 11

**OTHER AUTHORITIES**

Black's Law Dictionary (6th abridged ed. 1991)
    Public Office …………………………………………………………………………………. 23

Merriam Webster (online)
    Advise …………………………………………………………………………………………. 24
    Public Officer …………………………………………………………………………………. 23

# GLOSSARY OF ABBREVIATIONS

| ABBREVIATION | MEANING |
|---|---|
| AD | *Declaration of Jacob A. Appelsmith in Support of Opposition to Ex Parte Application for Protective Order (attached to the accompanying Williams Declaration as Ex. C)* |
| Appelsmith | *Jacob A. Appelsmith, Esq., Senior Advisor for the Office of the Governor* |
| General Council | *The entire adult membership of Pauma, which possesses plenary power over the Tribe's affairs* |
| Laird | *Deputy Attorney General T. Michelle Laird, Counsel of Record for the State Defendants* |
| LD | *Declaration of T. Michelle Laird in Support of Opposition to Ex Parte Application for Protective Order (attached to the accompanying Williams Declaration as Ex. D)* |
| MD | *Declaration of Randall Majel in Support of Pauma's Prior Ex Parte Motion for a Protective Order (attached to the accompanying Williams Declaration as Ex. F)* |
| Opp. | *State Defendants' Opposition to Pauma's Ex Parte Application for Protective Order (attached to the accompanying Williams Declaration as Ex. E)* |
| Pauma / Tribe | *Plaintiff, the Pauma Band of Mission Indians* |
| Rule 2-100 | *California Rule of Professional Conduct 2-100* |
| State | *Defendants, the State of California, California Gambling Control Commission ("CGCC" or "Commission"), and former Governor Arnold Schwarzenegger and his successors in interest* |
| Tribal Council | *The four-person executive body that carries out the General Council's orders and oversees Pauma's day-to-day affairs* |
| WD | *Declaration of Cheryl A. Williams in Support of Pauma's Prior Ex Parte Motion for a Protective* |

1          *Order (attached to the accompanying Williams
2          Declaration as Ex. B)*

3    WD2   *Declaration of Cheryl A. Williams in Support of
4          this Motion for Protective Order*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

After sitting on the information for in excess of a week, on August 4, 2011, counsel of record for the State disclosed that a senior attorney advisor with the Office of the Governor planned on conducting a discreet settlement meeting with select anonymous members of the Pauma Band of Mission Indian's ("Pauma" or "Tribe") Tribal Council without the knowledge or consent of the Tribe's counsel of record. LD, ¶¶ 4, 6; WD, ¶ 2. Following another week's worth of stonewalling, on August 15, 2011, Pauma moved the Court *ex parte* for a protective order pursuant to Federal Rule of Civil Procedure 26(c) ("Rule 26(c)") to prevent all non-policy making attorneys with the Attorney General's Office, the California Gambling Control Commission ("CGCC"), and the Office of the Governor from communicating with members of the Tribe about the litigation without the consent of Pauma's counsel of record. WD, ¶¶ 3-11; *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. State of Cal.*, Civ. Case No. 09-01955, Docket No. 118 (S.D. Cal. March 15, 2011) ("*Pauma*"). Without reaching the merits, Magistrate Judge Dembin denied the motion on August 23, 2011, indicating that he lacked the power to issue the requested order under Rule 26(c) in the absence of an ongoing discovery dispute. *Pauma*, Docket No. 124 (S.D. Cal. Aug. 23, 2011). When handling identical requests, other district courts have disregarded the Rule 26(c) label and heard the motion, *see Hammond v. City of Junction, Kan.*, 167 F.Supp.2d 1271, 1275 (D. Kan. 2001) ("*Hammond*") (considering a Rule 26(c) motion for a protective order to prevent *ex parte* communications in order to ensure compliance with disciplinary and ethical rules); *Turnball v. Topeka State Hospital*, 185 F.R.D. 645, 651 (D. Kan. 1999) ("*Turnball*") (same); in order to satisfy their affirmative duty to investigate and address any allegation of unethical conduct by one of the attorneys. *Gas-a-Tron of Az. v. Union Oil Co. of Cal.*, 534 F.2d 1322, 1324 (9th Cir. 1976).

Seeking to cure the technical defect in the prior *ex parte* motion, Pauma now brings the present motion to request that the Court address the merits of the arguments and grant alternate relief in the form of a general protective order outside the scope of Rule 26(c). Should the Court choose not to hear this motion for any reason, this memorandum also sets forth Pauma's objections to Magistrate Judge Dembin's order on the *ex parte* motion following the Legal Standard section, *infra*, for the purposes of preserving the Tribe's rights on appeal. Unfortunately, the need for a protective order has not dissipated. As previously stated in the *ex parte* motion, the Office of the Governor is represented by a

senior attorney advisor in all negotiations for tribal/State gaming compacts and the settlement of related bad faith lawsuits under the Indian Gaming Regulatory Act. *See* 25 U.S.C. § 2701 *et seq.* This attorney contends that he is a party to the litigation, and consequently able to communicate directly with representatives from Pauma about the underlying facts of the litigation and the potential for settlement. AD, ¶¶ 3-5, 10.

The State's counsel of record joins in this sentiment and insists that the attorney does not actually perform any legal work in his role as the representative for the Office of the Governor for Indian affairs. Opp., 1:23-27. Yet, the admissions in the State's response to the *ex parte* motion indicate that this is not the case, as the attorney has the ability to renegotiate the terms of the contract at issue in this suit, review pleadings prepared by the Attorney General's Office, and provide final review of legal correspondence from the Attorney General's Office to Pauma's counsel. LD, ¶ 11; Opp., 1:23-27; 9:2-5. Each of these functions comports with those performed by the attorney's predecessor, Legal Affairs Secretary Andrea Hoch, who made no qualms about the true nature of her position. LD, ¶ 3. In addition to performing these purely legal tasks, the attorney's penchant for corresponding with Pauma's former counsel about the litigation indicates that he too recognizes that he's participating in this matter in a legal capacity rather than as a party who is immunized from the contact of adversarial attorneys. AD, ¶¶ 6, 10-12.

In light of these admissions, Pauma, at a minimum, requests a ruling on the applicability of Rule 2-100 to this attorney. As indicated at the outset, the shape shifting nature of the attorney's involvement in this lawsuit poses more than a speculative future problem for Pauma. In his declaration, the State's attorney did not refute the allegation that he communicated with representatives from Pauma in the past about the subject matter of the litigation. In fact, the State dodged the issue by simply claiming, without support, that the attorney is not representing the Office of the Governor in this matter. Opp., 9:13-24. Additionally, in describing his most recent *ex parte* communications, the attorney passively admitted that "efforts were undertaken to coordinate a date and time" for the settlement conference, without explaining with whom those efforts were made. AD, ¶ 7. Considering all this, Pauma legitimately believes that the attorney may have acquired privileged information that the State could advance during future fact-based proceedings as the alleged fruit of a lawful discovery practice. To ascertain whether the State possesses such information, Pauma asks the Court to order the disclosure of all evidence

pertaining to the prior instances of unpermitted *ex parte* contact.  Additionally, Pauma further requests that the Court issue a protective order prohibiting future communications of this sort so the Tribe's counsel of record can return its focus to the principal proceedings instead of having to vigilantly police the actions of the various attorneys for the State who are involved in this litigation *sub rosa* – including one who is intent on corresponding with everyone **but** Pauma's counsel of record.  This remedy is necessary given the State's insistence that the Rules of Professional Conduct only apply to the three attorneys whose names appear on the caption of the State's pleadings.  Opp., 8:14-16.

## STATEMENT OF FACTS

Pauma is a federally-recognized Indian tribe in northern San Diego County with two hundred and twenty-eight members.  WD, Exs. 10 ¶¶ 14, 18; 11.   According to its Articles of Association, the body politic ("General Council") has plenary power over all internal affairs, including the retention of legal counsel and the approval of contracts and other arrangements with third parties.  WD, Ex. 12, § 6(A)-(C).   The breadth of these powers leaves the four-person Tribal Council with relatively few prescribed duties.  WD, Exs 11; 12, § 6(C).  Aside from effectuating all previously approved resolutions and ordinances, the central responsibility of the Tribal Council is to "[r]epresent the Band in all negotiations between the Band and local, State and Federal Governments, their agencies and officers," and to "[f]aithfully advise the General Council of all aforementioned negotiations."  WD, Ex. 6, § 6(C)(1)-(3).   In carrying out these intergovernmental relations, the Chairman is designated as "the official representative of the Band."  WD, Ex. 6, § 8(A).  If so requested, the Vice-Chairman can assist in the performance of these negotiations.  WD, Ex. 6, § 8(B).  However, neither the Secretary/Treasurer nor the remaining Council member has an approved role in the process.  WD, Ex. 6, § 8(C).

This procedure of conducting one-on-one negotiations with other sovereigns is common to all California tribes, as is evidenced by the seventy-nine Class III gaming compacts the Office of the Governor has executed with the relevant tribal chairpersons in this State.  *See* California Gambling Control Commission, Ratified Tribal-State Compacts, http://www.cgcc.ca.gov/?pageID=compacts (last visited Aug. 13, 2011).  In the compacting process, the tribal chairperson is not only the signatory to the final agreement, but the party responsible for conducting negotiations on behalf of his or her tribe or appointing the appropriate substitute proxy to do so.  WD, Ex. 10, §§ 12.3, 13.0, 15.6.  This arrangement

1   has remained constant over the past decade and was used by the present Governor twice this year when

2   executing new compacts with the Habematolel Pomo of Upper Lake ("Upper Lake") and the Pinoleville

3   Pomo Nation ("Pinoleville").  Office of Governor Edmund G. Brown Jr., Tribal State Compact between

4   the State of California and the Pinoleville Pomo Nation at §§ 15.3, 16.0, 18.7 (Aug. 8, 2011),

5   http://gov.ca.gov/docs/Pinoleville_Compact.pdf (last visited Aug. 14, 2011); Office of the Governor

6   Edmund G. Brown Jr., Tribal-State Compact between the State of California and the Habematolel Pomo

7   of Upper Lake at §§ 15.3, 16.0, 18.7 (2011), http://gov.ca. gov/docs/Compact-3_22_11.pdf (last visited

8   Aug. 14, 2011).

9        Representing the Office of the Governor throughout these two compact negotiations was an in

10  house senior attorney advisor named Jacob Appelsmith.  WD, ¶ 12; Exs. 13-14.  Mr. Appelsmith is a

11  rather distinguished attorney.  After graduating from the University of California Boalt Hall School of

12  Law, he spent six years working as a commercial litigator for Pillsbury, Madison & Sutro, a San

13  Francisco based law firm that merged with other prestigious regional firms to form what is now known

14  as Pillsbury Winthrop Shaw Pittman.  WD, Exs. 15-16.  After departing Pillsbury, Mr. Appelsmith spent

15  the next sixteen years working for the Attorney General's Office, ultimately achieving the rank of

16  Special Assistant to Attorney General Edmund G. Brown, Jr. on law enforcement and criminal justice

17  issues.  WD, Exs. 15-16.  When Attorney General Brown became Governor Brown, Mr. Appelsmith

18  moved over to the Capitol with him as a senior advisor for Indian affairs.  WD, Exs. 15-16.

19        Notably, this advisory position is not a public office.[1]   A full listing of the State's civil executive

20  officers is set forth within Section 1001 of the Government Code.   While the State may appoint

21  additional officers, each particular instance requires a nomination by the Governor, confirmation by the

22  Senate, and the recitation of the State oath of office by the chosen party.  Cal. Gov't Code §§ 1300,

23  1303, 1320.  After the completion of these three steps, the Senate will then deliver a certified copy of its

24  concurring resolution to both the Secretary of the State and the Governor to formally consummate the

25  process.  Cal. Gov't Code § 1321.  According to a press release from the Office of the Governor that

26  was released contemporaneously with his hire, Mr. Appelsmith's position as senior advisor "does not

27  ───────────────
    [1]      In addition to the advisory position, the Governor also appointed Mr. Appelsmith to head the
28  Department of Alcoholic Beverage Control.  WD, Exs. 15-16.  However, this position is completely
    distinct, with unique responsibilities, pay, sovereign powers, and public accountability requirements.

require Senate confirmation" nor provide him with any additional compensation on top of his standard salary for serving as the Director of the Department of Alcoholic Beverage Control.  WD, Ex. 16.  This press release fills in the gaps of the Secretary of the State's comprehensive roster of public officers, which makes no mention of any advisory position in the Office of the Governor as qualifying for public office status.  California Secretary of State, California Roster 2011, http://www.sos.ca.gov/admin/ca-roster/2011/pdf/00-2011-ca-roster.pdf (last visited Aug. 13, 2011).

However, being a personal and unaccountable senior legal advisor to the Governor has not stopped Mr. Appelsmith from communicating with representatives from Pauma about the merits of the lawsuit.  Coincidentally, each incident arose after Judge Burns stayed further discovery in this matter.  *Pauma*, Docket No. 64 (S.D. Cal. Dec. 17, 2010) (order staying discovery until further notice).  The first instance appears to have occurred this past January shortly after Mr. Appelsmith began advising the Governor on Indian gaming issues.  WD, ¶ 5; Ex. 3.  Even though this in-person meeting between Mr. Appelsmith and an unauthorized representative from the Tribal Council purportedly concerned the subject matter of the litigation, neither Mr. Appelsmith nor anyone with the Attorney General's Office ever informed Pauma's counsel that such a meeting took place.  WD, ¶ 5.  Eliminating any hope of this event being an isolated instance of *ex parte* contact, counsel of record for the Attorney General's Office ("Ms. Laird") informed Pauma's counsel on the afternoon of August 4th that Mr. Appelsmith had scheduled a discreet settlement meeting with select anonymous representatives from the Tribal Council for August 18th.[2]  WD, ¶¶ 2-3, 6; Ex. 4.  While Pauma's counsel was not included in the back-and-forth correspondence pertaining to the settlement meeting, Ms. Laird indicated that she saw the name of Rob Rosette, the Tribe's long since terminated attorney of record and Mr. Appelsmith's recent counterpart in the negotiations for the Upper Lake compact.  WD, ¶ 2, AD, ¶ 6; LD , ¶ 4; Opp., 2:3-11 ; Exs. 13-14.  Given the wording of the State's response, and Ms. Laird's refusal to divulge any information about the participants of the meeting, there is a strong likelihood that at least one Tribal Council member who was acting outside the scope of his authority was also involved in this exchange.  AD, ¶ 7; WD, ¶ 2.

After receiving verification that the General Council had not approved a meeting of this nature,

---

[2]    Mr. Appelsmith confirmed the veracity of these comments in a letter sent directly and exclusively to the Tribal Council, which the Tribe's administrative staff received on August 8th and forwarded to Pauma's counsel on the morning of August 15th.  WD, ¶ 6; Ex. 4.

1   Pauma's counsel contacted Ms. Laird the following morning to request that she forward the e-mail
2   correspondence regarding the pending settlement conference.  WD, ¶¶ 2-3; Ex. 1.  This August 5th e-
3   mail also reminded Ms. Laird that she and any other attorney acting on the State's behalf in connection
4   with the ongoing compact dispute must first obtain the consent of Pauma's counsel before
5   communicating with a representative of the Tribe about the lawsuit, even if the State did not initiate the
6   contact.  WD, ¶ 3; Ex. 1.

7        Failing to receive a response from any attorney with the State by the end of the business day on
8   August 8th, Pauma's counsel e-mailed a letter to Ms. Laird and Mr. Appelsmith, jointly, to inform the
9   latter of his ethical obligations under California Rule of Professional Responsibility 2-100 ("Rule 2-
10  100"), and to prevent any further *ex parte* communications about the litigation with representatives from
11  Pauma.  WD, ¶¶ 4-5; Ex. 3.  As well as serving as a courtesy reminder of this basic prohibition against
12  contacting an adverse represented party, the August 8th letter also requests that the State disclose all
13  evidence regarding its prior lawsuit-related contacts with representatives from Pauma either voluntarily
14  or pursuant to the State's Public Records Act.  WD, ¶ 5; Ex. 3; *see* Cal. Gov't Code § 6250 *et seq*.  In
15  closing, the August 8th letter emphasizes that "all future communications about the suit or settlement
16  should take place amongst the attorneys of record, aside from those taking place between the Tribal
17  Chairman and the Governor or a non-attorney member of his support staff."  WD, Ex. 3.

18        In response, the following afternoon Ms. Laird sent an e-mail indicating that she was in receipt
19  of both the August 5th e-mail and the August 8th letter addressed to her "client" in the Office of the
20  Governor, which concerned a "party-to-party meeting between the Governor's Office and some or all of
21  the Pauma Band of Mission Indians' Tribal Council currently scheduled for August 18, 2011."  WD, ¶
22  7; Ex. 5.  This quoted language is considerably different from Ms. Laird's comment during the August
23  4th phone call that the tentative settlement meeting was with Mr. Appelsmith, who is not a party to the
24  litigation, rather than a policy-making official or any other subordinate non-attorney employee with the
25  Office of the Governor.  WD, ¶ 7; Ex. 5.  Citing her pressing briefing commitments in connection with
26  the Reply to the State's Motion to Dismiss, Ms. Laird said that she would "respond to both of [the]
27  referenced communications as soon as possible but in no event later than the close of business on
28  Thursday, August 11, 2011."  WD, Ex. 5.

Once this deadline passed without word from the Attorney General's Office, Pauma's counsel called Ms. Laird to ascertain the State's position on these issues.  WD, ¶ 8.  In a nearly simultaneous e-mail response, Ms. Laird assured Pauma's counsel that a "written response to your two recent inquiries is currently being reviewed and finalized" and that she would deliver the response "via e-mail and U.S. Mail as soon as possible tomorrow."  WD, ¶ 8; Ex. 6.  Despite this assurance, Pauma's counsel still had not received the State's response by 3:00 PM of the following day.  WD, ¶ 9.  With the unauthorized settlement conference set to take place in four business days, Pauma's counsel sent one final e-mail to Ms. Laird, again inquiring whether the State intended to withhold the correspondence regarding the purported August 18th settlement conference and proceed with the pending meeting "despite receiving notice that it is not authorized by the Pauma tribal government."  WD, ¶ 9; Ex. 7.

Shortly before 5:00 PM on Friday August 12th, Ms. Laird e-mailed a terse response wherein she backtracked from her prior statements.  WD, ¶ 10; Ex. 8.  Even through the State's formal reply had been in the works for the better part of a week, this time Ms. Laird indicated that she could not relay the document because "Mr. Appelsmith [was] away from the office" and she had been unable to reach him. WD, Ex. 8.  Before ending her e-mail correspondence, Ms. Laird made sure to impress upon Pauma's counsel that she had no real duty to respond aside from the statutory one required for "proper" Public Records Act requests."  WD, ¶ 10; Ex. 8.

Dealing with attorneys who appeared intent on proceeding with their plan to conduct imminent *ex parte* communications, while zealously guarding the evidence of prior instances, on August 15, 2011, Pauma moved the Court *ex parte* for a protective order pursuant to Rule 26(c).  *Pauma*, Docket No. 118 (S.D. Cal. Aug. 15, 2011).  The requested protective order would have prevented any non-policy making attorney with the Attorney General's Office, the CGCC, and the Office of the Governor from communicating with representative of Pauma about the subject matter of the litigation without the advance consent of the Tribe's counsel of record; and required the State to promptly disclose all e-mails, notes, letters, memoranda, and other documents "constituting or referring to any such [prior *ex parte*] communication to or from any" Tribal member.  *Resnick v. Am. Dental Ass'n*, 95 F.R.D. 372, 377 (N.D. Ill. 1982) ("*Resnick*") (providing for identical relief in another case of *ex parte* communications).  Pauma's counsel viewed the protective order as necessary in order to block any improper future

1   settlement meetings, prevent future *ex parte* communications, and determine the extent of the existing

2   breach of the attorney client privilege.

3   Shortly before the filing of the *ex parte* motion, and well after the completion of the documents

4   comprising the filing, Ms. Laird finally provided Pauma's counsel with the State's long-awaited reply.

5   Therein, she indicated that Rule 2-100 does not prohibit an attorney employee for one of the parties from

6   communicating with the other party "without the involvement of the attorneys representing those

7   clients." LD, Ex. A.  Moreover, even if Rule 2-100 forbids such a practice, Mr. Appelsmith's contact

8   would still be permissible because "the Rule contains an exception for '[c]ommunications with a public

9   officer, board, committee, or body[.]' "  *Id.*  Despite advancing this argument, the State nonetheless

10  indicated that the impending settlement meeting was "postpone[d]" in "light of conflicting information

11  originating from two law firms, each purporting to represent the Tribe" in the litigation.  *Id.*  The August

12  15th letter does not identify the alleged competing law firm or provide any assurance that Mr.

13  Appelsmith would refrain from trying to circumvent Pauma's counsel in the hopes of setting the lawsuit.

14  On the following afternoon of August 16, 2011, the Office of the Governor e-mailed a letter to

15  Pauma's counsel that Mr. Appelsmith had mailed directly to the Tribal Council the day before.[3]  WD2, ¶

16  2; Ex. A; AD, ¶ 10; Ex. A.  Through the August 15th letter, Mr. Appelsmith informed the Tribal Council

17  that "[i]t is necessary to postpone our meeting in light of conflicting information originating from the

18  law firms of Williams and [sic] Cochran and Rosette and Associates, both of which purport to represent

19  Pauma."  *Id.*  Despite postponing the meeting, Mr. Appelsmith indicated his continued "willing[ness]

20  [3]     The recipients of the Office of the Governor's August 16th e-mail are Pauma's counsel and Rob
21  Rosette with the law firm of Rosette & Associates.  WD2, ¶ 2; Ex. A.  Curiously, Mr. Appelsmith's
    declaration indicates that Mr. Rosette received the letter attached to the August 16th e-mail a day early,
22  on August 15th, at which point Mr. Rosette called Mr. Appelsmith to reiterate that he represents the
    Pauma Tribal Council and that his client "intended no participation by the attorneys involved in the
23  litigation" at the settlement meeting.  AD, ¶¶ 10-11.  Pauma's counsel is perplexed as to why Mr.
    Appelsmith, who has personally negotiated two tribal/State compacts, would work with an attorney that
24  he knows no longer represents the Tribe in the litigation to stage a covert settlement meeting with un-
    customary tribal representatives without the knowledge or consent of the Tribe's longstanding attorneys
25  of record.  By simply calling Pauma's counsel, Mr. Appelsmith would have discovered that: (1) our firm
    represents Pauma in the litigation, and has throughout his entire tenure as senior advisor to the
26  Governor; (2) like every other tribe in the State, Pauma does not have separate counsel for its Tribal
    Council; and (3) even if it did, Chairman Majel is unaware of Mr. Rosette serving in such a capacity.
27  MD, ¶¶ 2-3.  But the more fundamental question is, if Mr. Appelsmith honestly views himself as a party
    to the litigation, why was he dealing with ***any*** attorneys instead of directly contacting Chairman Majel
28  about settling the matter at a properly-structured and attended settlement conference?

Case No.: 09CV1955 LAB AJB

1    and availabl[ility] to meet with Pauma's Tribal Council in my position as the Governor's advisor on

2    tribal matters, not as legal counsel to any party, to confidentially discuss possible settlement of the

3    federal action[.]"  *Id*.  This August 15th letter is the last communication Pauma's counsel has received

4    from the State regarding the propriety of Mr. Appelsmith's view that he can communicate with Pauma

5    representatives about the present suit without the prior approval of the Tribe's counsel of record.

6           With respect to the *ex parte* motion, the State did not file an opposition by 5:00 PM of the

7    business day following service of process, the cut-off ordinarily imposed by Judge Battaglia's chamber

8    rules.  Upon referral of the *ex parte* motion, Judge Dembin ordered the State to respond by the close of

9    business on August 22, 2011.  *Pauma*, Docket No. 122 (S.D. Cal. Aug. 17, 2011).  Although it did, the

10   State's response is replete with contradictions.  On one hand, the State claims that Mr. Appelsmith is the

11   Governor's senior advisor for Indian affairs and "provides no legal advice and renders no legal services

12   in this capacity."  Opp., 1:23-24.  On the other hand, the State conversely explains that Mr. Appelsmith

13   occupies a traditional legal position, negotiates all new or amended Tribal-State gaming compacts (i.e.

14   drafts the terms of these legally binding contracts, like the one that is at issue in the present case), and

15   even "undertakes to review proposed pleadings" in the present action.  Opp., 1:25-27; 9:2-5; LD, ¶ 3.

16   As to this last point, Ms. Laird further admits that Mr. Appelsmith even conducts the final review of

17   legal correspondence the Attorney General's Office sends to Pauma's counsel.  LD, ¶ 11.  As a second

18   example of the doublespeak in the State's response, Mr. Appelsmith, who claims immunity from

19   unauthorized attorney contact based upon his status as a party to the litigation, freely communicates with

20   other attorneys purporting to represent Pauma in this matter even though he knows they no longer serve

21   in that capacity.  AD, ¶¶ 6, 11-12; LD, ¶ 4; Opp., 2:3-11  In addition to advancing these irreconcilable

22   statements, the State's response also does not refute the allegation that Mr. Appelsmith has previously

23   communicated with representatives of Pauma about the lawsuit without the knowledge of the Tribe's

24   counsel of record.  In order to avoid the subject, Ms. Laird repeatedly argues that the only attorneys for

25   the State who are subject to Rule 2-100 are the Attorney General and the "designated attorneys

26   employed in that office" whose names appear on the pleadings.  Opp., 8:14-18; 9:13-24; 10:1-3.

27          Rather than address the question of whether Mr. Appelsmith's conduct violated Rule 2-100, the

28   State instead asked the Court to deny the *ex parte* motion for largely procedural reasons, including its

1    contention that the Federal Rules of Civil Procedure does not authorize the issuance of a protective order

2    in the absence of a discovery request.  Opp., 4:8-9; 5:19-20; 8:5-6.  On August 23, 2011, Judge Dembin

3    agreed with the State's argument, denying the *ex parte* motion in full because "there [wa]s no discovery

4    dispute before the Court" that would authorize a protective order.  *Pauma*, Docket No. 118 (S.D. Cal.

5    Aug. 23, 2011).

6        In support of its decision, the order cites "*U.S. v. Sierra Pac. Indians,* 759 F.Supp.2d 1215, 1217

7    (E.D. Cal. 2011)"[4] for the proposition that a federal court may issue a protective order to prevent *ex*

8    *parte* communications only when the other party is "engaging in the challenged activity for the purposes

9    of gathering discovery."  Other district courts to address identical requests have disregarded the Rule

10   26(c) designation and proceeded to entertain the motion as a request for a protective order generally.

11   *See Hammond,* 167 F.Supp.2d at 1275 ("The Court nevertheless has the power to issue an order to direct

12   the conduct of counsel and to require counsel's adherence to applicable disciplinary and ethical rules…

13   The court will therefore consider the motion."); *Turnball,* 185 F.R.D. at 651 ("Independent of the rule,

14   the court may issue a protective order, if necessary to direct the conduct of a party or counsel.  The court

15   has inherent power to require adherence by counsel to applicable disciplinary rules… These include the

16   Model Rules of Professional Conduct[.]").  This keeps with the district court's affirmative duty to

17   examine any allegation of unprofessional conduct raised by one of the parties.  *Gas-a-Tron of Az.,* 534

18   F.2d at 1324 ("We agree… 'whenever an allegation is made that an attorney has violated his moral and

19   ethical responsibility, an important question of professional ethics is raised.  It is the duty of the district

20   court to examine the charge, since it is that court which is authorized to supervise the conduct of the

21   members of its bar.' " (quoting *Richardson v. Hamilton Int'l Corp.,* 469 F.2d 1382 (3d Cir. 1972)).

22       Since Pauma's original *ex parte* motion was denied on a purely technical ground, Pauma now

23   moves the Court for alternate relief, specifically requesting that the Court (1) address the applicability of

24   Rule 2-100 to Mr. Appelsmith; (2) issue a protective order preventing any non-policy making attorney

---

25   [4]      The order misstates the case name as *United States v. Sierra Pacific Indians* instead of *United*
26   *States v. Sierra Pacific Industries*.  While *Sierra Pacific* deals with the issuance of a Rule 26(c)
     protective order to prevent *ex parte* communications, the opinion does not confine a district court's
27   authority to grant the requested relief to situations involving discovery disputes.  In fact, as is explained
     in the Legal Standard section, *infra,* a district court should overlook the Rule 26(c) designation and
     consider issuing a protective order whenever the relevant motion raises an allegation that an attorney has
28   breached his ethical duties.

with the Attorney General's Office, the CGCC, or the Office of the Governor from communicating with any representative of Pauma about the subject matter of the litigation without the presence or prior approval of the Tribe's counsel of record; and (3) require the State to promptly disclose all evidence of Mr. Appelsmith's prior lawsuit-related *ex parte* contacts with representatives of the Tribe in order to rectify the apparent breach of the attorney-client privilege.

### LEGAL STANDARD

A court may issue a protective order to prohibit an attorney from engaging in *ex parte* communications about the subject matter of a lawsuit with an adverse represented party. *See,* e.g.*, U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252 (8th Cir. 1998) ("*McDonnell Douglas*"); *Hammond*, 167 F.Supp.2d at 1275; *Turnball*, 185 F.R.D. at 651. A court should consider providing this remedy, as well as addressing any underlying allegations regarding ethical violations, even if the party mistakenly moves under Rule 26(c). *Hammond*, 167 F.Supp.2d at 1275; *Turnball*, 185 F.R.D. at 651. The reason for this is that district courts have an affirmative duty to examine any allegation of unprofessional conduct, and to take the necessary corrective and disciplinary actions. *Gas-a-Tron of Az.,* 534 F.2d at 1324; *see Erickson v. Newmar Corp.*, 87 F.3d 298, 300 (9th Cir. 1996) ("The district court has the duty and responsibility of supervising the conduct of attorneys who appear before it."); *Trust Corp. of Mont. v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983); *Empire Linotype School v. U.S.,* 143 F.Supp. 627, 631 (S.D.N.Y. 1956) ("[I]t is the responsibility of the Court to ascertain whether there is any merit to the accusation when once an alleged violation of the Canons has been called to the Court's attention."); 7 C.J.S. Attorney & Client § 42 (2011) ("The ethical rules encompassed in such codes are highly persuasive and due the utmost consideration, and the courts should not denigrate such provisions by indifference.").

### OBJECTIONS TO ORDER ON EX PARTE MOTION [FED. R. CIV. P. 72(A)]

#### I.   SUMMARY OF OBJECTIONS TO AUGUST 23, 2011 ORDER DENYING EX PARTE MOTION

**Objection No. 1 (contrary to law):** The Order fails to address the merits of the Motion or even analyze the facts regarding the improper communications Pauma seeks to prevent, in contravention of the Ninth Circuit's mandate that district courts examine any charge that an attorney violated his ethical duties. *Gas-a-Tron of Az.,* 534 F.2d at 1324-25.

**Objection No. 2 (contrary to law):** The Order denies the Motion on the non-substantive basis that it fails to present a discovery dispute pursuant to Rule 26(c), a technicality that courts often overlook in order to fulfill their affirmative duty to require counsel to adhere to applicable ethical rules. *Hammond,* 167 F. Supp. 2d at 1275; *Turnball,* 185 F.R.D. at 651.  Thus, the Court had both the power and the duty as set forth in *Gas-a-Tron* to look past the discovery label and examine the merits of the ethics allegations in the Motion and the movant's need for protective relief.

**Objection No. 3 (clearly erroneous and contrary to law):** To the extent there are findings of fact, the Order wholly adopts Defendants' assertion that Mr. Appelsmith is not acting as an attorney in his position with the Office of the Governor without examining the nature of the work he actually performs.  This conclusion is both contrary to the authority cited in the Motion and clearly erroneous in light of information submitted by the parties.

**II.    EXPLANATION OF OBJECTIONS**

**A.    OBJECTION NO. 1: THE ORDER IS CONTRARY TO NINTH CIRCUIT PRECEDENT REQUIRING COURTS TO EXAMINE ALLEGATIONS OF UNETHICAL CONDUCT.**

The Order provides little analysis, choosing instead to summarily deny the Motion on the basis that Pauma did not allege a discovery dispute pursuant to Rule 26(c).  As a result, the Order ignores the fifteen pages of allegations that Mr. Appelsmith violated Rule 2-100, which provides that"[w]hile representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer."  In fact, the Order disposes of this concern through a one-sentence summation of the unsupported argument in the Defendants' Response: "Defendants admit that the representative of the Governor is an attorney but that he is not acting as such – he is the party representative of the Governor's office in this litigation and also serves as the representative of the Governor's Office in Tribal matters."  This wholesale adoption of Defendants' conclusory allegations falls far short of the Ninth Circuit's mandate that district courts "examine" any charge of unethical conduct.  *Gas-a-Tron of Az.,* 534 F. 2d at 1324-25 ("Whenever an allegation is made that an attorney has violated his moral and ethical responsibility, an important question of professional ethics is raised, and it is the duty of the district court to examine the charge, since it is that court which is authorized to

1   supervise the conduct of the members of the bar." (citation omitted)); *see also Erickson,* 87 F.3d at 303

2   (indicating the district court's failure to comply with *Gas-A-Tron* caused unfair prejudice to the

3   complaining party and required a new trial).

4        Gauging whether a party has violated Rule 2-100 requires a review of the authority defining the

5   contours of Rule 2-100 and the application of the proffered facts to those standards.  Here, this process

6   would necessarily entail examining whether Mr. Appelsmith is a party to the suit, as Defendants

7   contend, or an in house legal advisor for the Office of the Governor who is actively participating in the

8   litigation, as Pauma counters.  If the latter is the case, then the Court would need to also determine

9   whether Mr. Appelsmith qualifies for the "public officer" exception to Rule 2-100.  While the State did

10  not address any of this in its Response, these topics were all analyzed at length in the original fifteen-

11  page Motion.  Only a detailed review of these issues can satisfy the Ninth Circuit's mandate in *Gas-a-*

12  *Tron* that district courts carefully examine any allegation of unethical conduct.  Accordingly, the Order's

13  failure to do so is contrary to law, and grounds for the District Court to require the Court to address the

14  allegations in the Motion in light of the previously-submitted argument.  *See Trone v. Smith,* 621 F.2d

15  994, 999 (9th Cir. 1980) (overturning the denial of motion to disqualify where district court failed to

16  review the scope of attorney's work in prior and present representation).

17
     **B.    OBJECTION NO. 2: THE ORDER IS CONTRARY TO LAW REQUIRING COURTS TO LOOK
18          PAST TECHNICAL DEFECTS IN ORDER TO ADDRESS ALLEGATIONS OF ETHICAL
            MISCONDUCT.**

19        The Order denies the Motion on the non-substantive basis that it fails to present a discovery

20  dispute pursuant to Rule 26(c).  When handling identical requests, other district courts have disregarded

21  the Rule 26(c) label and proceeded to entertain the motion, *see Hammond,* 167 F.Supp.2d at 1275

22  (considering a Rule 26(c) motion for a protective order to prevent *ex parte* communications in order to

23  ensure compliance with applicable disciplinary and ethical rules); *Turnball,* 185 F.R.D. at 651; in order

24  to satisfy their affirmative duty to investigate and address any allegation of unethical conduct by one of

25  the parties.  *Gas-a-Tron*, 534 F.2d at 1324-25.  Thus, the Court had both the power and the duty to

26  overlook the discovery label and examine the merits of the allegations in the Motion.  Given the Court's

27  failure to do this, the District Court should find the Order contrary to law and require the Court to

28

1    address the Motion in light of the previously-submitted argument.

2        **C.    OBJECTION NO. 3: THE ORDER'S WHOLESALE ADOPTION OF THE STATE'S ARGUMENT**
3        **THAT JACOB APPELSMITH IS NOT PARTICIPATING AS AN ATTORNEY IN THIS MATTER IS**
         **BOTH CLEARLY ERRONEOUS AND CONTRARY TO LAW.**

4        Assuming the Order makes a finding of fact regarding Mr. Appelsmith's role with the Office of

5    the Governor, which is entirely unclear given the sparse nature of the eight sentence Order, it wholly

6    adopts Defendants' assertion that Mr. Appelsmith is acting as a non-attorney political go-between by

7    stating: "Defendants admit that the representative of the Governor is an attorney but that he is not acting

8    as such – he is the party representative of the Governor's office in this litigation and also serves as the

9    representative of the Governor's Office in Tribal matters."

10       Where there is a wholesale adoption of one party's findings or arguments, as may be the case in

11   the Order, the district court must carefully and thoroughly scrutinize the magistrate judge's findings and

12   the evidence in the record.  *Holland v. Island Creek Corp.,* 885 F.Supp. 4, 6 (D.D.C. 1995) (indicating

13   "it is incumbent on the Court to check the adopted findings against the record 'with particular, even

14   painstaking care" if the magistrate judge does not offer a reasoned explanation for his decision); *cf.*

15   *Silver v. Executive Car Leasing Disability Plan,* 466 F.3d 727, 733 (9th Cir. 2006) (requiring a careful

16   inspection of the record when district court wholly adopts prevailing party's findings).  Here, a careful

17   review of the record reveals that any finding that Mr. Appelsmith is not participating as an attorney in

18   this case is clearly erroneous in light of the evidence, and contrary to the law concerning Rule 2-100.

19       The Defendants describe the work performed by Mr. Appelsmith on behalf of the Governor in

20   connection with this suit as follows: (1) reviewing the pleadings before their filing, and providing final

21   review of the Attorney General Office's legal correspondence to Pauma's counsel prior to its

22   transmission (Declaration of T. Michelle Laird, Docket No. 123-3 ("Laird Dec."), ¶ 3); (2) negotiating

23   and drafting the terms of new and amended tribal-State compacts, like the one in this lawsuit

24   (Appelsmith Dec., ¶ 3); (3) and attempting to settle the instant action via negotiation of a new compact

25   (Appelsmith Dec., ¶¶ 6-8).[5]  The authority cited within the Motion undeniably proves that these acts are

26   _____

27   [5]   Notably, Ms. Laird explains that the person who performed these duties for Governor
     Schwarzenegger was "Secretary of Legal Affairs" Andrea Hoch, who unquestionably acted as an
28   attorney on behalf of the Governor during the eight months worth of pre-suit negotiations in the present
     matter.  Laird Dec., ¶ 3.  The fact that Governor Brown chose a different label for Mr. Appelsmith does

*per se* legal in nature and thus trigger the application of the California Rules of Professional Conduct. *See* Formal Opinion No. 1988-103 of the State Bar of Cal. (citing *Smallberg v. State Bar,* 212 Cal. 113 (1931) (the practice of law includes "the perform[ance] of services in any matter pending in a court… throughout the various stages," including "the rendering of legal advice and counsel in the preparation of legal instruments and contracts by which legal rights are secured.")); *Libarian v. State Bar*, 21 Cal.2d 862 (1943) ("He should appreciate that when he is licensed to practice as an attorney at law, the professional services that he thus performs are performed by him as an attorney, whether or not some of the services could also be rendered be one licensed in a different profession. One who is licensed to practice as an attorney in this state must conform to the professional standards in whatever capacity he may be acting in a particular matter.").  Considering this, the attempted settlement of an existing lawsuit is not only considered the performance of legal work but a violation of the ethical rules when the responsible attorney interacts with a represented client to accomplish this end without the consent of his or her counsel of record.  *See Abeles v. State Bar*, 9 Cal.3d 603 (1973) (holding that it was improper for an attorney to engage in a settlement conference with the opposing party behind the back of their counsel); *Turner v. State Bar,* 36 Cal.2d 155 (1950) (indicating an attorney was not working in a ministerial capacity when he drew up settlement papers for an represented adverse party); *see also* Ethics Opinion 1968-2 of the San Diego County Bar Ass'n ("[I]t was a breach of legal ethics for counsel for defendant to attend a meeting for the purpose of settling the dispute without first notifying and obtaining the consent of counsel for the Plaintiff.").  Thus, a careful review of the record shows that the Court's potential finding that Mr. Appelsmtih is not acting as an attorney is both clearly erroneous in light of the submitted evidence and contrary to law regarding the existence of an attorney-client relationship and the application of Rule 2-100.

## ARGUMENT

**I.   AS THE STATE'S PRINCIPAL NEGOTIATOR OF TRIBAL/STATE GAMING COMPACTS LIKE THE ONE HEREIN INVOLVED, JACOB APPELSMITH VIOLATED RULE 2-100 BY ENGAGING IN EX PARTE COMMUNICATIONS WITH REPRESENTATIVES FROM PAUMA FOR THE PURPOSE OF ATTEMPTING TO SETTLE THE CASE WITHOUT THE KNOWLEDGE OF THE TRIBE'S COUNSEL OF RECORD.**

not change the inescapable fact that he performs legal work on behalf of the Office of the Governor with respect to this litigation.

Rule 2-100 is a 'no contact' rule which states that "[w]hile representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer."[6]   *U.S. v. Sierra Pac. Indus.,* 759 F.Supp.2d 1215, 1216 (E.D. Cal. 2011) ("*Sierra Pacific*") (quoting Rule 2-100).   "[The no contact rule] shields the opposing party not only from an attorney's approaches which are intentionally improper, but, in addition, from approaches which are well intentioned but misguided." *Mitton v. State Bar*, 71 Cal.2d 524, 534 (1969).   The courts employ a bright line rule that looks past the motives of the implicated attorney because "the rule exists in order to preserve[e]… the attorney-client relationship and the proper functioning of the administration of justice." *U.S. v. Talao*, 222 F.3d 1133, 1138 (9th Cir. 2000) ("*Talao*") (internal quotations omitted).

## A.   JACOB APPELSMITH REPRESENTS THE OFFICE OF THE GOVERNOR IN ALL GAMING COMPACT MATTERS.

After reviewing the State's response to the *ex parte* motion, the crux of Ms. Laird's position is that Mr. Appelsmith is not representing the Office of the Governor in connection with the tribal/State gaming compact issues herein involved.   The ethics laws of this or any state would have little effect if they were unable to reach beyond the docket and apply to all the other attorneys who are silently working behind the scenes on a particular lawsuit.[7]   The ABA recognized as much when it drafted its version of the 'no contact' rule to protect "against possible overreaching by other lawyers who are participating in the matter."   Model Rules of Prof'l Conduct R. 4.2 cmt. 1 (1983) (emphasis added).

---

[6]     Similar versions of this rule are in effect in all fifty states and within the jurisdiction of the American Bar Association ("ABA").   *In re Dale*, 2005 WL 1389226, *5 n.6 (Cal.Bar Ct. 2005).   The primary textual difference among the various renditions of the rule pertains to its scope, and whether it protects only represented "parties" or other "persons" involved in a proceeding like witnesses.   *Id.*   Since this issue is largely immaterial to the present motion, Pauma will cite to the rules, comments, and ethics opinions from the ABA and other comparable jurisdictions when necessary to provide additional support for its arguments.   This approach seems consistent with the Civil Local Rules, which indicate the California Rules of Professional Conduct are not the sole resource for adjudging compliance with prevailing ethical standards, and that, at a minimum, a district judge may consider the analogous rules under the ABA.   Civ.LR 83.4(b).

[7]     This is certainly a concern in this case since Ms. Laird contends that the only attorneys subject to Rule 2-100 are the Attorney General and the two other "attorneys employed in that office" who are designated on the caption of the State's pleadings.   Opp., 8:14-16.   Accepting Ms. Laird's argument would mean that any one of the hundreds of non-captioned attorneys working for the Attorney General's Office, the CGCC, or the Office of the Governor could correspond with representatives from Pauma about the subject matter of the litigation without the advance consent of our firm.   Needless to say, Pauma's counsel roundly objects to the State's interpretation of Rule 2-100.

1   Thus, the central question is whether Mr. Appelsmith has an attorney-client relationship with the

2   Governor in connection with the Indian gaming issues that are at the heart of the present action. *See*,

3   e.g., Formal Opinion No. 1993-132 of the State Bar of Cal.; Advisory Opinion No. 1984 of the Wash.

4   State Bar Ass'n (1997) ("The prohibition of RPC 4.2 thus depends on the existence of an attorney-

5   client relationship and a communication in the context of the representation."); Advisory Opinion No. 1738 of

6   the Wash. State Bar Ass'n (1997) ("Whether RPC 4.2 applies depends on whether the licensed attorney

7   is providing legal representation or advice.").

8       In California, an attorney-client relationship arises from either an express or implied contract.

9   *Responsible Citizens v. Superior Court*, 16 Cal.App.4th 1717 (5th Dist. 1993) (stating that the existence

10  and nature of an implied attorney-client relationship is determined by the totality of the circumstances,

11  including the parties conduct).  When a party seeking legal advice consults an attorney at law and

12  secures that advice, the relation of attorney and client is established *prima facie*. *Perkins v. W. Coast

13  Lumber Co.*, 129 Cal. 427, 429 (1900); *see* Formal Opinion No. 1993-132 of the State Bar of Cal.

14  ("Courts are especially prone to find that an attorney-client relationship has arisen when a putative client

15  reveals information in confidence to one he knows to be an attorney." (citing, e.g., *Miller v. Metzinger*,

16  91 Cal.App.3d 31 (2d Dist. 1979); *Ferrara v. La Sala*, 186 Cal.App.2d 263 (2d Dist. 1986);

17  *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir. 1978))). By naming Mr.

18  Appelsmith his senior advisor for Indian gaming, there is no doubt that Governor Brown sought to have

19  someone in house who could offer candid and independent advice on compacting issues, taking into

20  account not only the law but other considerations such as "moral, economic, social and political factors,

21  that may be relevant to the [the State's] situation." Model Rules of Prof'l Conduct R. 2.1 (1983).  After

22  all, the Office of the Governor had a pressing need for an attorney to act in this position given the recent

23  rash of federal court decisions that altered the State's existing contractual obligations with its sixty-plus

24  gaming tribes, and its legal obligations to any tribe that approaches the negotiating table with the hopes

25  of securing a new or amended compact. *See*, e.g., *Cachil Dehe Band of Wintun Indians of Colusa

26  Indian Cmty. v. State of Cal.*, 618 F.3d 1066 (9th Cir. 2010) (providing an additional 8,050 gaming

27  device licenses to tribes with 1999 compacts); *Rincon Band of Luiseno Mission Indians of the Rincon

28  Reservation v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010) (imposing significant constraints on, if

1   not altogether baring, the State's receipt of general fund revenue sharing under tribal/State compacts).

2   With remarkable verve, Mr. Appelsmith has taken the reins of his advisory position and negotiated the

3   terms of new gaming compacts with Upper Lake and Pinoleville, as well as represented the Governor in

4   the court-ordered mediations in the Rincon and Big Lagoon "bad faith" lawsuits.  WD, ¶ 12; Exs. 16-17

5   ("Brown's negotiator, Jacob Appelsmith, called the [Upper Lake] compact 'a model for how the state

6   and local communities and tribes can all work together toward achieving something positive for each of

7   their interests.' ").  More than being just a participating attorney, Mr. Appelsmith is in fact ***the*** attorney

8   for the State in all of its Indian gaming issues.

9       This perception gains support from Mr. Appelsmith's admissions within his signed declaration.

10   Despite certifying that he provides neither legal advice nor legal services in his capacity as senior

11   advisor to the Governor on Indian affairs, *see* AD, ¶¶ 3-4; Mr. Appelsmith goes on to admit that he has

12   responsibility for negotiating the terms of each and every binding gaming contract between the State and

13   its hundred plus Indian tribes.  AD, ¶ 3.  At no point does Mr. Appelsmith indicate that he serves as a

14   middleman, simply conveying the Office of the Governor's negotiation demands to an attorney from the

15   Attorney General's Office who then hammers out the financial and regulatory terms of the agreements.

16   Rather, Mr. Appelsmith's declaration indicates that he performs this task himself, which aligns with the

17   traditional function of his position, the information in prior newspaper articles, and the representations

18   of the attorneys for the Rincon Band and the Big Lagoon Rancheria.  WD, ¶¶ 12, 16-17, Exs. 13-14; LD,

19   ¶ 3.

20       The notion that Mr. Appelsmith may have shed his legal responsibilities and approached this

21   case from a purely political perspective is a fallacy.  The courts of this State have no shortage of

22   opinions indicating that the practice of law includes "the perform[ance] of services in any matter

23   pending in a court… throughout the various stages," including "the rendering of legal advice and

24   counsel in the preparation of legal instruments and contracts by which legal rights are secured."  Formal

25   Opinion No. 1988-103 of the State Bar of Cal. (citing *Smallberg,* 212 Cal. at 113).  Irrespective of the

26   full extent of his indeterminate involvement in this matter, the moment Mr. Appelsmith offered to speak

27   for the Governor in settlement negotiations is when he unequivocally started acting as an attorney for the

28   State and came into conflict with volumes of State common law and ethics opinions from around the

country saying *ex parte* communications about settlement with represented parties are impermissible. *Abeles,* 9 Cal.3d at 603 (holding that it was improper for an attorney to engage in a settlement conference with the opposing party behind the back of their counsel); *Turner,* 36 Cal.2d at 155 (indicating an attorney was not working in a ministerial capacity when he drew up settlement papers for an represented adverse party); *see* Ethics Opinion 1968-2 of the San Diego County Bar Ass'n (Dec. 3, 1968) ("[I]t was a breach of legal ethics for counsel for defendant to attend a meeting for the purpose of settling the dispute without first notifying and obtaining the consent of counsel for the Plaintiff."); Formal Opinion No. 2005-6 of the Or. State Bar (Aug. 2005) (indicating an attorney may not negotiate with a represented party without the consent of opposing counsel); Formal Opinion No. 22 of the Idaho State Bar ("A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel."); Informal Ethics Opinion No. RI-145 of the State Bar of Mich. (Oct. 1, 1992) ("There can be little doubt that [*ex parte* settlement communication] transgresses MRPC 4.2."); Opinion No. 768 of the N.Y. State Bar Ass'n (Oct. 8, 2003) (stating a government lawyer may not "transmit information – whether it be the government's legal position or negotiation of contractual points – to a person the lawyer knows to be represented by counsel"); Opinion 17 of the State Bar of Texas, 18 Baylor L. Rev. 200 (Dec. 1948) (prohibiting counsel from "communicating with a party represented by an attorney for any purpose," including that which is "design[ed] to negotiate a compromise").

Moreover, the most recent settlement communication, with its citation to the evidentiary rules under federal and state law, is not the only legal act Mr. Appelsmith has performed in this case. As the State's response explains, Mr. Appelsmith has "often undertake[n] to review" Ms. Laird's substantive pleadings before their ultimate filing, *see* Opp., 9:2-5; and has even conducted the "final review" of legal correspondence from the Attorney General's Office to Pauma's counsel. LD, ¶ 11. While the State may advance this point to try and paint Mr. Appelsmith as an interested client, it conversely makes him look like the lead attorney on the litigation, and the person who has to provide the stamp of approval before the State disseminates any new legal arguments. This belief certainly gains credence from Mr. Appelsmith's status as the State's go-to attorney on gaming compact issues. AD, ¶ 3; Opp., 1:25-27.

But identifying the precise moment when Mr. Appelsmith performed his first legal act in this matter is unnecessary because attorneys throughout the State are subject to the rules of professional conduct even if they are providing services in a different capacity, such as acting as a surrogate for the Governor. *Librian,* 21 Cal.2d at 862 ("He should appreciate that when he is licensed to practice as an attorney at law, the professional services that he thus performs are performed by him as an attorney, whether or not some of the services could also be rendered be one licensed in a different profession. One who is licensed to practice as an attorney in this state must conform to the professional standards in whatever capacity he may be acting in a particular matter."); *see* Formal Opinion No. 1993-132 of the State Bar of Cal.; Informal Ethics Opinion No. RI-166 of the State Bar of Mich. (June 3, 1993) ("Lawyers are subject to the Michigan Rules of Professional Conduct (MRPC) at all times, whether functioning in a legal or nonlegal capacity.").  Thus, the breach of the rules of professional conduct arose with the first *ex parte* communication pertaining to the lawsuit, which seems to have occurred this past January.  WD, ¶ 5; Ex. 3.  At that point, even if he wasn't "representing" the Office of the Governor in the present matter in the truest and most technical sense of the word, Mr. Appelsmith should have been aware of the overarching prohibition preventing attorneys for the State from speaking with representatives from Pauma about the litigation without the advance consent of the Tribe's counsel of record.  This rule is inflexible, and Mr. Appelsmith cannot circumvent it by simply deciding that he would rather conduct *ex parte* communications through the Tribe's former counsel of record with whom he has a preexisting relationship.

While the State may argue that requiring Mr. Appelsmith to comply with the rules of professional conduct would impede the ability of the Office of the Governor to disseminate policy advice on Indian gaming issues, this problem is self-inflicted and results from concentrating potentially incompatible job responsibilities within a single position. *Cf,* e.g., Formal Opinion No. 1993-132 of the State Bar of Cal. ("By choosing to simultaneously represent Client and to serve as a director of Corporation, the attorney runs significant risks of violating ethical rules").  But such an overblown claim of prejudice misses the fact that the Governor and his non-attorney employees still have a direct line of communication with Pauma, and Mr. Appelsmith can continue to communicate with "represented person[s]… concerning matters outside the representation."  Model Rules of Prof'l Conduct R. 4.2 cmt.

4.  Moreover, this slight and albeit necessary restriction on speech is not unworkable.  Should he need to relay a message from the Capitol that arguably relates to the compact litigation, Mr. Appelsmith can contact Pauma's counsel of record to either transmit the message or ask for permission to deliver it directly to an appropriate representative from Pauma.  Aside from establishing an open dialogue with Pauma's counsel, Mr. Appelsmith can also request instructions from the Court as to whether his intended communication would comply with Rule 2-100.  Model Rules of Prof'l Conduct R. 4.2 cmt. 6.  Looking at the present situation in retrospect, following either one of these route would have ensured the sanctity of all privileged information, and removed the exigency of alerting the Court to multiple apparent violations of the ethical rules.

### B.  EACH TRIBAL COUNCIL MEMBER QUALIFIES AS A PARTY TO THE LAWSUIT.

The protections afforded by Rule 2-100 apply not only to the represented entity, but also to any person that has a position of managerial authority within it.  According to Rule 2-100(B)(1), the term represented party includes "[a]n officer, director, or managing agent of a corporation or association."  Before this rule became operative in 1989, the State courts released a series of opinions concerning an attorney's yet-to-be-addressed ethical responsibilities when dealing with a represented entity.  In the first of these cases, the court made it clear that opposing counsel cannot contact a director of a represented corporation because the fiduciary has a seat on the board and is potentially exposed to privileged litigation information.  *Mills Land & Water Co. v. Golden W. Refining Co.*, 186 Cal.App.3d 116, 127-28 (4th Dist. 1986).  In addition to the dangers posed to the director personally, the *ex parte* communication would undercut the corporation's ability to secure the advice of counsel before providing the opposing party with the opportunity to access the information; impair corporate counsel's ability to control the litigation; and sully the court's responsibilities by requiring it to make numerous difficult, fact-intensive determinations as to whether the proffered statements occurred within the course and scope of employment and can thus be fairly imputed to the corporate entity.  *Id*. at 127-129.  Two years later, the same appellate court extended the holding in *Mills Land* to any "managerial employee" who has an "active, ongoing relationship with the corporate entity and might sustain prejudice as a consequence of the contact or make statements on the corporate employer."  *Hewlett Packard Co. v. Superior Court*, 252 Cal.Rptr. 14, *17 (4th Dist. 1988); *see* Formal Opinion No. 2005-80 of the Or. State Bar (Aug. 2005)

1   ("If Current Employee is part of corporate management or a corporate officer or director, then Current

2   Employee is 'represented' within the meaning of this rule even though Current Employee is not

3   individually represented by Defense Lawyer.").

4      This prohibition against *ex parte* communications applies even if a dissident director with his

5   own personal representation initiates contact with opposing counsel regarding an ongoing civil suit in

6   which the corporation is the adverse party.  Formal Opinion No. 1991-125 of the State Bar of Cal. ("The

7   Committee is aware that the rule prohibits *ex parte* contact with the dissident director regardless of

8   whether or not he is named as a party in the action by the individual client against the corporation.").

9   While the presence of personal counsel may insulate the dissident director from the "feared intrusive

10  acts" of the opposing attorney, it does nothing for the absent entity since the substitute attorney would

11  likely "take no action to protect the corporation which is adverse to his dissident director client." *Id*.

12  With the release of Opinion No. 1991-125, the State ethics laws have covered the gamut of potential *ex*

13  *parte* communications in the represented entity context, and shown that each and every one of them is

14  impermissible without the prior consent of the association's counsel of record for a particular matter.

15     As indicated in the Statement of Facts, *supra*, Pauma has four Tribal Council members and two

16  hundred and twenty-four other members who play an active role in directing the business, legal, and

17  political affairs of the Tribe.   WD, Exs. 10-12.   From what Pauma's counsel can surmise, Mr.

18  Appelsmith has directly communicated with multiple members of the Tribe about the merits of the case

19  and the potential for settlement.  WD, ¶¶ 5-6; Exs. 3-4.  This includes members of the Tribal Council,

20  who routinely receive privileged information about the litigation and are presumably capable of making

21  statements that a court would impute against the Tribe as a whole.  WD, ¶¶ 5-6; Ex. 3-4.  Given this, at a

22  minimum the appropriate Tribal parties to this litigation for purposes of Rule 2-100 are the four Tribal

23  Council members, if not the entire General Council.

24     Should the Court determine otherwise, then Pauma's counsel would face serious difficulty in

25  controlling the litigation.  As Ms. Laird suggests, *see* Opp., 8:14-16; any non-captioned attorney for the

26  Attorney General's Office, the CGCC, or the Office of the Governor could then bypass Pauma's counsel

27  and directly contact anywhere from four to two hundred and twenty-eight persons within the Tribe for

28  privileged material or to rally sentiment for a lowball settlement offer.  In the words of the Ninth Circuit,

1   "the trust necessary for a successful attorney-client relationship is eviscerated when the client is lured

2   into clandestine meetings with the lawyer for the opposition." *U.S. v. Lopez*, 4 F.3d 1455, 1458-59 (9th

3   Cir. 1993). This is equally true when the meetings are with singular discontented representatives for a

4   much larger body. Since the fundamental purpose of Rule 2-100 is to "preserve[e]… the attorney-client

5   relationship and the proper functioning of the administration of justice," the Court should find that each

6   of the four Tribal Council members are immunized parties that the attorneys for the State cannot contact

7   about the substance or the settlement of the litigation without the prior consent of Pauma's counsel of

8   record. *Talao*, 222 F.3d at 1138.

9           **C.**    **THE PUBLIC OFFICE EXCEPTION DOES NOT EXEMPT JACOB APPELSMITH FROM RULE**
10               **2-100'S PROHIBITION ON EX PARTE COMMUNICATIONS.**

11      The drafters of Rule 2-100 inserted an exception to the general prohibition against *ex parte*

12  communications to ensure a party retains the First Amendment right to petition the government about its

13  grievances. In specific, the 'no contact' rule does not prohibit "[c]ommunications with a public officer,

14  board, committee, or body." Rule 2-100(C)(1). The term officer refers to "duly-appointed or elected

15  public officers of a state, county, township, city or other subdivision of the state, as distinguished from

16  mere employees thereof." *Cleland v. Superior Court*, 52 Cal.App.2d 530, 533 (3d Dist. 1942); *see*

17  Public Office, Black's Law Dictionary 1230 (6th ed. abridged 1991) (identifying five requirements for a

18  public office, including the creation of the position through a legislative act, defined duties, a reasonable

19  degree of permanence, and the ability to act independently); Public Officer, Merriam-Webster.com,

20  http://www.merriam-webster.com/dictionary/public officer (last visited Aug. 12, 2011) ("[A] person

21  who has been legally elected or appointed to office and who exercises governmental functions.").

22      None of the particulars of Mr. Appelsmith's advisory position with the Office of the Governor

23  raise even the slightest inference that it is a public office. WD, Exs. 15-16  Mr. Appelsmith was not

24  elected to the position, nor did he go through the Senate confirmation process, which is a necessary step

25  for receiving a public appointment. WD, Ex. 16; Cal Gov't Code § 1303 ("Every person who exercises

26  any function of a public office without taking the oath of office, or without giving the required bond, is

27  guilty of a misdemeanor."). As well as being unaccountable to the people of the State, the advisory

28  position is unpaid and lacks an identifiable job description in the Government Code, previously-issued

1   Executive Orders, or unofficial informational materials on the Office of the Governor's website.   WD,

2   Ex. 16.   Perhaps most importantly, according to its very definition, an advisor does not have the ability

3   to exercise any degree of sovereign authority, as it simply provides "recommendation[s] about what

4   should be done" to another person who can.   Advise, Merriam-Webster.com, http://www.merriam-

5   webster.com/dictionary/advisor (last visited Aug. 13, 2011).   These facts taken together lead Pauma's

6   counsel to believe that Mr. Appelsmith is simply a senior legal advisor for the Governor who does not

7   benefit from the Rule 2-100(C)(1) exception.   *See Cleland*, 52 Cal. App.2d at 537 ("[N]either the

8   Legislature nor the board fixed the term of office as required by the Constitution. He was merely

9   appointed to serve as such superintendent at the will of the board. No term was fixed. His duties were

10  not prescribed by the Legislature. These circumstances enforce the conclusion that the Legislature did

11  not intend… to authorize a board of supervisors to create and appoint a [position as] an additional

12  county officer.").

13          The State Bar's perception of the intended meaning of public officer is much the same.   In an

14  interim opinion that it has yet to formally adopt, the State Bar indicated the term covers a person "who,

15  for example, has the authority to address, clarify or alter governmental policy; to correct a particular

16  grievance; or to address or grant an exemption from regulation."   *Sierra Pacific¸* 759 F.Supp.2d at 1216

17  (citing Proposed Formal Opinion Interim No. 98-0002 of the State Bar of Cal.).   This scope of this

18  language covers "policy-making official[s] or persons with authority to change a policy or grant some

19  specific request for redress that [a complainant] was presenting."   *Id.* at 1217.   Regardless of the counter

20  argument, the essential nature of an advisory position ensures that it will always be one seat removed

21  from a position capable of changing governmental policy or redressing prior wrongs.

22          Additionally, general principles of federal law indicate that this unobstructed line of

23  communication with the government closes upon the filing of a complaint if an implicated public party

24  happens to be an attorney.   In litigation, the status of a governmental agency is akin to that of any other

25  organizational party, and thus a private attorney cannot contact an involved official except with the prior

26  approval of the agency or in respect to general policy matters.   Restatement (Third) of Law Governing

27  Law. §§ 101(2), 101 cmt. c (2000) ("In any specific-claims representation, contact is permissible with

28  officers of governmental agencies other than the agency specifically involved and with officers of the

governmental agency in question who do not have power to bind the agency with respect to the specific matter."); *accord* Opinion No. 09-1 of the Florida Bar (Dec. 10, 2010); Opinion No. 812 of the N.Y. State Bar Ass'n (May 3, 2007); Opinion No. 652 of the N.Y. State Bar Ass'n (Aug. 27, 1993).  Echoing the remainder of the analysis in this memorandum, the flipside of this rule is that a governmental attorney is similarly precluded from contacting a private litigant without the prior consent of opposing counsel unless the communication relates to an unrelated policy issue.  The attempted settlement of a pending lawsuit obviously does not fall within this category.  WD, ¶¶ 2, 5-6; Exs. 3-4.   As such, the Court should find that Mr. Appelsmith is not a public official who can take advantage of the limited exception to the 'no contact' rule, and move on to remedying the situation.

### D.   THE REQUESTED RELIEF IS CUSTOMARY IN CASES INVOLVING EX PARTE COMMUNICATIONS.

In cases involving *ex parte* communications, courts will typically restrain the offending attorney from having further unauthorized contact with members of the represented party about the subject matter of the litigation, as well as require the disclosure of all evidence pertaining to the prior unethical events. *See Resnick*, 95 F.R.D. at 377 (indicating that the court ordered defense counsel to refrain from communicating with any member of the plaintiff class and to deliver all notes, memoranda, and documents "constituting or referring to any such communication to or from any class member."); *Sierra Pacific*, No. 09-02445 JAM EFB, Docket No. 92, slip op. at 12:8-11 (E.D. Cal. Nov. 15, 2010) ("[Attorney] must identify all federal employees contacted without the knowledge of counsel for the United States in the matter to date, as well as the dates and circumstances of each contact, and produce originals and copies of all recordings or documents relating to such communications"); *see also McDonnell Douglas,* 32 F.3d at 1257-58; *Hammond,* 167 F.Supp.2d at 1292-93.  In the interests of justice, Pauma's counsel requests the same relief so it can determine whether the State has obtained privileged information that it may subsequently use during future fact-based proceedings as the alleged fruit of a lawful discovery process.  Additionally, enjoining the non-policy making attorneys with the implicated State agencies from communicating with Pauma representatives about the lawsuit without the presence or prior approval of the Tribe's counsel of record is necessary since the State still contends that Rule 2-100 only applies to attorneys whose names appear on the caption of the parties' filings.

**CONCLUSION**

For the foregoing reasons, Pauma respectfully requests that the Court: (1) address whether Rule 2-100 applies to Mr. Appelsmith; (2) issue a protective order preventing any non-policy making attorney with the Attorney General's Office, the CGCC, or the Office of the Governor from communicating with representatives of Pauma about the subject matter of the litigation without the presence or prior approval of the Tribe's counsel of record; and (3) require the State to promptly disclose all e-mails, notes, letters, memoranda, and other documents "constituting or referring to any such [prior *ex parte*] communications to or from any" Tribal member.  *Resnick,* 95 F.R.D. at 377.  Additionally, Pauma further requests that the Court reserve the right to take additional corrective or disciplinary measures based upon the content of the evidence provided.

RESPECTFULLY SUBMITTED this 6th day of September, 2011

THE PAUMA BAND OF MISSION INDIANS

By: */s/ Kevin M. Cochrane*
Cheryl A. Williams
Kevin M. Cochrane
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
525 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 793-4809